**EXHIBIT**

**A**

| | |
|---|---|
| DISTRICT COURT OF PUEBLO COUNTY, STATE OF COLORADO 501 N. ELIZABETH STREET PUEBLO, CO 81003 | DATE FILED: July 17, 2019 6:00 PM FILING ID: F3F8DCC48F2A0 CASE NUMBER: 2019CV30424 |

**PLAINTIFFS:**

**R.M.H. HOLDINGS, INC.**, a Wyoming corporation; and **PEYTON PALAIO**, an individual

**v.**

**DEFENDANTS:**

**AMERICAN HEMP OPERATORS**, a Colorado general partnership; **MATTHEW SCHWAIGERT**, an individual; and **PAUL MCGEARY**, an individual.

▲COURT USE ONLY▲

*Attorneys for Plaintiff:*
Garrett O. Graff, #47539
Samuel J. Scheurich, #46270
Darren B. Kaplan, #52603
HOBAN LAW GROUP
730 17th Street, Suite 420
Denver, CO 80202
P: (303) 674-7000
F: (303) 382-4685
garrett@hoban.law
samuel@hoban.law
darren.kaplan@hoban.law

Case No.:

Courtroom:

**VERIFIED COMPLAINT FOR DAMAGES AND PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF AND JURY DEMAND**

COMES NOW, Plaintiffs R.M.H. Holdings, Inc. ("RMH") and Peyton Palaio ("Palaio") (collectively, "Plaintiffs"), by and through their undersigned counsel, file this Verified Complaint for Damages and Preliminary and Permanent Injunctive Relief and Jury Demand against Defendants American Hemp Operators ("AHO"), Matthew Schwaigert ("Schwaigert"), and Paul McGeary ("McGeary") (collectively "Defendants"), state and allege as follows:

## PARTIES

1.      RMH is a Wyoming corporation registered to conduct business in Colorado with a principal place of business at 23298 US Highway 160, Springfield, CO 81073.

2.      Peyton Palaio is an individual and owner of RMH residing in Forsych County, Georgia.

3.      Upon information and belief, AHO is an expired general partnership with a principal place of business at 652 East Industrial Blvd., Pueblo West, CO 81007.

4.      Upon information and belief, Schwaigert registered AHO with the Colorado Secretary of State as a general partnership.

5.      Upon information and belief, Schwaigert is an individual residing in Denver County, Colorado with a mailing address of 1309 South Gaylord Street, Denver, CO 80210.

6.      Upon information and belief, McGeary is an individual residing in Baca County, Colorado, with a mailing address of 25336 County Road, Springfield, CO 81073.

## JURISDICTION AND VENUE

7.      Venue in the County of Pueblo, Colorado is appropriate pursuant to C.R.C.P. 98(c).

8.      Jurisdiction is proper pursuant to C.R.S. § 13-1-124(1).

## GENERAL ALLEGATIONS

*RMH Business*

9.      RMH is in the business of cultivating crops, notably industrial hemp, and processing industrial hemp into processed material ("RMH Business").

10.      RMH is registered with the Colorado Department of Agriculture ("CDA") to conduct the RMH Business.

11.     RMH owns approximately 36 acres of agricultural land in Baca County, Colorado to conduct RMH Business in furtherance of RMH Business (the "Baca Property").

12.     RMH also has a processing facility on the Baca Property to conduct RMH Business.

13.     RMH owns and/or leases land in Colorado other than the Baca Property in furtherance of RMH Business (the "Other Property").

14.     To assist with RMH Business, RMH employed Schwaigert and McGeary who agree to work for RMH under certain terms and conditions. ("Agreement"). A copy McGeary's employment agreement is attached to this Verified Complaint as **Exhibit 1**.

15.     At all times relevant herein, Schwaigert and McGeary exercised plenary control over the RMH Business, including cultivation of crops, receipt of business proceeds, including those derived from the harvesting crops, and ordering supplies.

16.     In or around April 2019, Plaintiffs became aware of misconduct perpetuated by Defendants Schwaigert and McGeary to the detriment of the RMH Business.

17.     On or about May 30, 2019, RMH terminated Schwaigert and McGeary.

*Formation of AHO to RMH Detriment*

18.     Upon information and belief, prior to December 11, 2017, Schwaigert and McGreary formed a Colorado general partnership by the name of American Hemp Operators ("AHO").

19.     On or about December 11, 2017, Schwaigert registered the tradename "American Hemp Operators" on behalf of AHO.

20.     Upon information and belief, AHO is in the same or substantially similar business as RMH, namely the cultivation and processing of industrial hemp (the "AHO Business").

21.     Upon information and belief, AHO is registered with the CDA to conduct the AHO Business.

22.     Upon information and belief, AHO has utilized RMH's CDA registration number in furtherance of the AHO Business.

23.     Using their positions with RMH, Schwaigert and McGeary oversaw the negotiation and performance of multiple contracts between RMH and AHO, which included the exchange of goods and monies between AHO and RMH.

24.     Prior to RMH entering into any contract with AHO Schwaigert and McGeary represented to Plaintiffs that the "Jager family" owned AHO.

25.     RMH relied on this representation prior to entering into any contract with AHO.

26.     At the time of this representation, Schwaigert and McGeary knew that the Jager family did not own AHO and that Schwaigert and McGeary, in reality, did.

27.     Prior to RMH entering into any contract with AHO, Schwaigert and McGreary did not disclose their ownership and/or control of AHO.

28.     After convincing RMH to enter into contracts with AHO, Schwaigert and McGeary used their positions in both to benefit AHO to the detriment of RMH.

*Conversion of RMH Goods and Funds*

29.     Upon information and belief, between late 2017 and early 2018, Schwaigert and McGeary converted between 160 to 260 of RMH's industrial hemp plants from the Baca Property for AHO use and benefit.

30.     Upon information and belief, between late 2017 and early 2018, Schwaigert and McGeary converted approximately 200 of RMH's unused two-gallon planting pots for AHO use and benefit.

31.     Upon information and belief, between July 2017 and May 2019, Schwaigert converted a "super sack" of RMH's industrial hemp seeds for AHO use and benefit.

32.     Upon information and belief that between November and December of 2018, Defendant McGeary stole 10 lbs. of "F5" type seeds and 20 lbs. of "blue" type seeds and transferred these seeds to his personal shop in Elder, Colorado. An estimated value of seeds of these types is approximately $26,000.00 each per pound or approximately $780,000.00 in total value. Both of these quantities of seed are Plaintiffs' property.

33.     Upon information and belief, between July 2017 and May 2019, Schwaigert made multiple equipment and/or supply orders for RMH's Baca Property and then directed RMH employees, without RMH approval, to take whatever items they wanted from these orders for personal use.

34.     Upon information and belief, Schwaigert and/or McGeary took equipment and/or supplies from these orders for AHO use and benefit.

35.     Upon information and belief, Schwaigert and McGeary converted numerous RMH lighting supply deliveries for AHO use and benefit.

36.     Upon information and belief, between September and October 2018, Schwaigert and/or McGeary converted RMH's Hasamax pesticide, mending tape, vine clips, and other yet-unidentified items for AHO use and benefit.

37.     Upon information and belief, on or about April 3, Defendants used RMH funds to purchase 17.25 tons of NH3 Fertilizer at a cost of $10,178.71. This fertilizer was never returned to Plaintiffs and it is Plaintiffs' belief that Defendants used this fertilizer on their own farm.

38.     Upon information and belief, between July 2017 and May 2019, Schwaigert and/or McGeary used RMH funds to purchase diesel fuel for their personal use and benefit and/or for AHO use and benefit.

### Misappropriation of Trade Secrets

39.     Upon information and belief, between July 2017 and May 2019, Schwaigert and McGeary misappropriated RMH's genetics, plants, and planting methods (the "Protected Information") for AHO use and benefit.

40.     Defendants knew the Protected Information was proprietary and was only to be used in furtherance of the RMH Business.

### Misuse of Other Property

41.     Upon information and belief, in Summer and/or Fall 2018, McGeary represented to Plaintiffs that (1) it was not possible to plant industrial hemp on the Other Property that season; (2) RMH could yield three to four harvests of hay already planted on the Other Property; and (3) RMH would realize gross sales of approximately $255,000 for such harvests.

42.     Based on McGeary's representation, RMH directed McGeary to cultivate and harvest hay on 240 acres of the Other Property (the "Hay").

43.     Upon information and belief, the Hay yielded approximately three to four harvests.

44.     McGeary sold and/or relocated the Hay from the Other Property.

45.     To date, RMH has only received approximately $56,000.00, in the form of multiple checks for the Hay.

46.     As part of their employment with RMH, Schwaigert and McGeary were responsible for the safekeeping of these checks.

47.     In 2018, Schwaigert and McGeary lost, stole, and/or misappropriated at least one check.

48.     To date, Schwaigert and McGeary have not obtained a replacement for the lost check(s).

49.     To date, RMH has received limited proceeds for the Hay.

50.     Upon information and belief, AHO received and used the Hay for its own benefit.

51.     Upon information and belief, a former employee of RMH, Sierra Abbott, converted and/or destroyed the check(s) at the direction of one or more Defendants for the benefit of one or more Defendants.

52.     Upon information and belief, RMH lost possession of the check(s) on or around the date RMH terminated Ms. Abbott.

53.     As part of his employment with RMH, Schwaigert oversaw RMH's termination of Ms. Abbott.

54.     RMH has no records of its termination of Ms. Abbott.

55.     Upon information and belief, at all times relevant herein Schwaigert and Ms. Abbot were romantically involved.

56.     Upon information and belief, and not limited to, in or around April or May 2019, Schwaigert and/or McGeary converted the Planter for AHO use and benefit, specifically for the

purposes of furtherance of AHO Business and not RMH Business and further deprived its use during the optimal planting season.

*Purchase of Unnecessary, Additional Property*

57.     McGeary owned a plot of land adjacent to the Other Property (the "Additional Property").

58.     In early 2019, McGeary represented to Plaintiffs that their acquisition of the Additional Property was necessary to create efficiencies and generally improve the RMH Business.

59.     Plaintiffs relied on this representation when purchasing the Additional Property for $400,000.00.

60.     After closing the purchase of the Additional Property, which took place on April 15, 2019, Plaintiffs discovered they had been deceived in that (1) the Additional Property was worth a far lesser value, and (2) the Additional Property created no benefit to the RMH Business.

## FIRST CLAIM FOR RELIEF
## NEGATIVE INJUNCTIVE RELIEF –WASTE
### (All Defendants)

61.     Plaintiffs incorporate by reference herein all previously alleged paragraphs that are set forth above.

62.     Defendants continue to damage, steal, and misappropriate Plaintiffs' goods and funds, in part for use on their own property, as alleged in the factual background above.

63.     Defendants' actions constitute waste, for which they are responsible.

64.     As a result of the waste committed by Defendants, Plaintiffs have sustained and will continue to sustain substantial damages which are impossible to quantify at this time and Plaintiffs will suffer irreparable injury that can only be prevented by injunctive relief.

65.     Without a preliminary and permanent injunction prohibiting the above continued conduct by Defendants, there can be no plain, speedy, or adequate remedy at law.

66.     The granting of the preliminary and permanent injunction will not disserve the public interest. Equity and the principles of justice required that Defendants be enjoined from engaging in the acts and omissions stated above.

67.     The balance of equities favors a preliminary and permanent injunction.

68.     A preliminary injunction is needed to preserve the status quo pending trial on the merits.

**SECOND CLAIM FOR RELIEF**
**AFFIRMATIVE INJUNCTIVE RELIEF – MANDATORY PERFORMANCE**
**PURSUANT TO C.R.C.P. 65(f)**
**(All Defendants)**

69.     Plaintiffs incorporate by reference herein all previously alleged paragraphs that are set forth above.

70.     Defendants continue to damage, steal, and misappropriate Plaintiffs' goods and funds, in part for use on their own property, as alleged in the factual background above.

71.     Defendants are in possession of Plaintiffs' funds and property.

72.     Merely restraining Defendants will not effectuate the relief sought herein, as the aforementioned property and funds have already been misappropriated as alleged herein, and it is possible Defendants will destroy said funds and property, further damaging Plaintiffs.

73.     As a result of the acts committed by Defendants, Plaintiffs have sustained and will continue to sustain substantial damages which are impossible to quantify at this time and Plaintiffs will suffer irreparable injury that can only be prevented by injunctive relief.

74.     Due to the fact that mere restraint is insufficient, it is appropriate to affirmatively enjoin Defendants and require that they restore to Plaintiffs any property and funds they have fraudulently, forcefully, or violently deprived from Plaintiffs.

75.     Without a preliminary and permanent injunction requiring the actions described above, there can be no plain, speedy, or adequate remedy at law.

76.     The granting of the preliminary and permanent injunction will not disserve the public interest. Equity and the principles of justice required that Defendants be enjoined as described above.

77.     The balance of equities favors a preliminary and permanent injunction.

78.     A preliminary injunction is needed to preserve the status quo pending trial on the merits.

### THIRD CLAIM FOR RELIEF
### CIVIL THEFT
### (against all Defendants)

79.     Plaintiffs incorporate by reference herein all previously alleged paragraphs that are set forth above.

80.     Defendants knowingly obtained, retained, or exercised control over Plaintiffs' funds and property without authorization and by threat or deception.

81.     Defendants intended to deprive permanently Plaintiffs of their funds and/or property.

82.     Defendants knowingly used, concealed, or abandoned said funds or property in such a manner to deprive the other person permanently of its use or benefit.

83. Defendants used, concealed, and/or abandoned Plaintiffs' funds and property intending that such use, concealment, or abandonment would deprive Plaintiffs' permanently of their use or benefit.

84. Plaintiffs incurred damages as a result of Defendants' actions.

85. Defendants' theft and the resulting damages to Plaintiffs were attended by circumstances of negligence, malice, and willful and wanton conduct.

## FOURTH CLAIM FOR RELIEF
### CONVERSION
### (against all Defendants)

86. Plaintiffs incorporate by reference herein all previously alleged paragraphs that are set forth above.

87. Defendants knowingly obtained control over Plaintiffs' funds and property without authorization.

88. Defendants did so with the specific intent to permanently deprive Plaintiffs of the benefit of those funds and property.

89. Plaintiffs incurred damage and continue to incur damage as a result of Defendants' actions.

## FIFTH CLAIM FOR RELIEF
### CIVIL CONSPIRACY
### (against all Defendants)

90. Plaintiffs incorporate by reference herein all previously alleged paragraphs that are set forth above.

91. Defendants agreed by words or conduct between and among themselves to misappropriate Plaintiffs' funds and/or property for their own benefit.

92.     The unlawful acts that Defendants committed to accomplish this goal have been alleged in this Complaint.

93.     Plaintiffs have suffered damages and continue to suffer damages, in an amount to be proved at trial, as a proximate result of Defendants' actions.

### SIXTH CLAIM FOR RELIEF
### BREACH OF CONTRACT
### (against Defendants Schwaigert and McGeary)

94.     Plaintiffs incorporate by reference herein all previously alleged paragraphs that are set forth above.

95.     The Agreement is a valid and enforceable contract.

96.     Defendants have breached their obligations under the Agreement by, *inter alia*, misappropriating confidential and proprietary information; misappropriating Plaintiffs' funds, property, and company materials; breaching the special trust and confidence instilled in them by Plaintiffs; and working for the betterment of Defendant AHO, with use of Plaintiffs' funds, property, company materials, and trade secrets, for their own personal benefit during hours which should have been spent working for Plaintiffs.

97.     Plaintiffs have suffered damages and continue to suffer damages, in an amount to be proved at trial, as a proximate result of Defendants' breach of the Agreement.

### SEVENTH CLAIM FOR RELIEF
### UNJUST ENRICHMENT
### (against all Defendants)

98.     Plaintiffs incorporate by reference herein all previously alleged paragraphs that are set forth above.

99.     Upon information and belief and on or about the aforementioned time-frame, Defendants have intentionally misappropriated Plaintiffs' funds and property.

100.    These funds and property were taken from Plaintiffs without their consent.

101.    Under the circumstances detailed herein, it would be unjust for Defendants to retain these funds and property.

## EIGHTH CLAIM FOR RELIEF
## TORTIOUS INTERFERENCE OF CONTRACT
### (against AHO)

102.    Plaintiff incorporates by reference herein all previously alleged paragraphs that are set forth above.

103.    AHO, as Schwaigert and McGeary's company, was at all relevant times aware of the Agreement and its terms.

104.    AHO assisted Schwaigert and McGeary's conversion and/or theft of RMH funds and property by receiving, using, and benefiting from such converted funds and property, such conduct constituting Schwaigert and McGeary's breach of the Agreement.

105.    RMH has suffered damages and continues to suffer damages, in an amount to be proved at trial, as a proximate result of AHO's interference with the Agreement.

## NINTH CLAIM FOR RELIEF
## DECEIT BASED ON FRAUD
### (against Schwaigert and McGeary)

106.    Plaintiffs incorporate by reference herein all previously alleged paragraphs that are set forth above.

107.    Defendants Schwaigert and McGeary made false representations, including, without limitation, that the "Jager family" owned AHO and that RMH would benefit from the

purchase of the Additional Property, to induce Plaintiffs to enter into agreements for the sole benefit for AHO.

108.    The representations of Defendants Schwaigert and McGeary constitute material facts.

109.    At the time these representations were made, Defendants Schwaigert and McGeary either knew they were false or were aware that they did not know whether the representations were true or false.

110.    Defendants made these representations with the intent that Plaintiffs would rely upon them.

111.    Plaintiffs relied upon these representations when entering into agreements with AHO and purchasing the Additional Property.

112.    Plaintiffs' reliance on these representations was justified due to the position Defendants Schwaigert and McGeary held at RMH.

113.    Plaintiffs' reliance caused them injuries, damages, and losses.

## TENTH CLAIM FOR RELIEF
### MISAPPROPRIATION OF TRADE SECRETS, C.R.S. § 7-74-101 and 18 U.S.C. § 1836(b)(2)(A)(ii), *et seq.*
### (against all Defendants)

114.    Plaintiffs incorporate by reference herein all previously alleged paragraphs that are set forth above.

115.    The Protected Information, which was disclosed to Defendants Schwaigert and McGeary as part of their employment with RMH, included trade secrets.

116.    Defendants knew of their obligation not to disclose the Protected Information to third parties.

117.     RMH took significant steps to maintain and protect the Protected Information, including, without limitation, limiting access to the Protected Information to certain individuals, including relevant clauses in Schwaigert and McGeary's employment Agreements, and employing security systems and contractors to guard the Protected Information.

118.     Despite RMH's efforts, Defendants managed to acquire and misappropriate the Protected Information, which has allowed Defendants to realize unjust profits, gains, and advantages.

119.     Defendants Schwaigert and McGeary were acting within the scope of their Defendant AHO authority when they engaged in the above-described acts.

120.     Defendant AHO, by virtue of its receipt and use of the Protected Information and the authorized actions of its agents, AHO is jointly and severally liable for Defendants misappropriation of the Protected Information.

121.     As a result of Defendants' conduct, Plaintiffs have been suffered damages and continue to suffer damages, in an amount to be proven at trial.

### ELEVENTH CLAIM FOR RELIEF
### REPLEVIN
### (against all Defendants)

122.     Plaintiffs incorporate by reference herein all previously alleged paragraphs that are set forth above.

123.     RMH is the rightful owner of all funds and property, including, without limitation, industrial hemp plants, industrial hemp seeds, plating pots, and the Planter (collectively, "the Converted Property").

124.     The Converted Property is fully described herein.

125. Defendants have retained the Converted Property, refusing to return the Converted Property to RMH.

126. The Converted Property is known to be in Defendants' possession, at various locations.

127. Upon information and belief, the Converted Property has not been taken for tax assessment or fine pursuant to any statute against RMH, nor has the Converted Property been seized under an execution of judgment against RMH.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request an entry of judgment in its favor and against Defendants, and that Plaintiffs be awarded:

a) Actual damages;

b) Consequential damages;

c) Special damages as allowed by statute or other applicable law;

d) Attorney fees and costs as allowed by contract or law;

e) Pre- and post-judgment interest as allowed by law;

f) All rights and remedies based in replevin, as defined in C.R.C.P. § 104.

g) And such other further relief this Court deems just, proper, and equitable.

Plaintiffs further request that this Court enter a preliminary injunction, restraining and enjoining the Defendants, its officers, members, agents, employees and attorneys or any action by or through Defendants from committing waste, in any manner, in regard to Plaintiffs' property and funds. Plaintiffs request that this Court mandate that Defendants return said misappropriated property and funds to Plaintiffs pursuant to C.R.C.P. 65. If deemed necessary by the Court, the Plaintiffs request

that the Court conduct a hearing on this Verified Complaint. Plaintiffs also seek costs and expenses of this action to the fullest extent permitted by law.

Dated this 3rd day of July, 2019

Respectfully Submitted,

HOBAN LAW GROUP

*s/ Garrett O. Graff*
Garrett O. Graff, #47539
Samuel J. Scheurich, #46270
Darren B. Kaplan, #52603

*Attorneys for Plaintiffs*

Plaintiffs' Address

23298 US Hwy 160
Springfield, CO 81073

## VERIFICATION

STATE OF GEORGIA          )
                                         )ss.
COUNTY OF Cobb        )

Peyton Palaio, being of lawful age and being first duly sworn upon oath, deposes and states that the matters set forth in the above Verified Complaint are true.

_____
Peyton Palaio

Subscribed and sworn before me this 15th day of July , 2019 by Peyton Palaio.

My commission expires: 9/18/2020 .

Amber Fuller
NOTARY PUBLIC
Cobb County, GEORGIA
My Comm. Expires 08/18/2020

_____
Notary Public

# EMPLOYMENT AND RESTRICTIVE AGREEMENT

THIS EMPLOYMENT AND RESTRICTIVE AGREEMENT (this "Agreement") is made as of the _____ day of _____, 20__, by and between _____ Holdings, LLC, a Colorado limited liability company, for and on behalf of itself, and its present and future affiliates and subsidiaries, if any (the "Company"), and the undersigned (the "Employee"), an individual, who resides at the address stated below. The Company and the Employee may be referred to in this Agreement individually as a "Party" or collectively as the "Parties".

**WHEREAS**, the Company is engaged in the business of the research, development, growing and processing of industrial hemp and manufacturing numerous products from such crops, as well as consulting for other persons within the same area of the agricultural industry; and

**WHEREAS**, the Company presently has operating locations in Georgia, Oregon, Colorado, Washington and North Carolina and has clients both domestically and internationally, with plans for continued growth; and

**WHEREAS**, the Company desires to enter into this Agreement with the Employee on the terms and conditions set forth in this Agreement; and

**WHEREAS**, the Employee desires to be employed by the Company subject to the terms and conditions contained in this Agreement; and

**WHEREAS**, the Employee is or will be in possession of selective or specialized skills, education, experience, methodology, abilities, customer contacts, customer information, pricing, customer requirements, customer improvement results, trade secrets, and confidential information by reason of having provided services for Company; and

**WHEREAS**, the Parties are entering into this Agreement to, among other things, establish the rights and obligations of Employee and Company during the business relationship, as well as to establish how Employee may use and must handle Company's Confidential Information and Trade Secrets (as those terms are defined below).

**NOW THEREFORE**, in consideration of the premises and the mutual agreements and obligations set forth below in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby expressly acknowledged, the Company and the Employee agree as follows:

## SECTION 1
## EMPLOYMENT

**1.1** **In General.** The Employee shall be employed by the Company at the location and in the position stated in Exhibit A, which is attached hereto and made a part hereof. The Employee will perform all duties customarily incident to the Employee's position and such duties that are reasonably and properly assigned to the Employee from time to time by the

Employee Initials

Company and/or the Employee's supervisor, including, but not limited to, those duties set forth on Exhibit A.

**1.2    Employment At-Will.** Both the Company and the Employee acknowledge that the Employee's employment is "*at-will*," and may be terminated by either party at any time, with or without cause, by giving verbal or written notice to the other Party. Nothing in this Agreement or in any written or oral communication between the Company and the Employee constitutes an offer or agreement by the Company to employ the Employee for any particular length of time nor by the Employee to remain employed for any particular length of time.

**1.3    Full Time and Attention.** While employed by the Company, the Employee shall devote the Employee's best efforts and entire time, full attention and energy to the business of the Company. The Employee shall not, without the prior written consent of the Company, engage in any other business activity that might negatively impact the Employee's ability to devote the Employee's best efforts, full attention and energy to the Employee's duties for the Company. The Employee owes an undivided duty of loyalty to the Company and the Employee may not work for or provide services to any person or entity in competition with the Company while employed by the Company.

## SECTION 2
## COMPENSATION

**2.1    Salary.** For services rendered to the Company, the Employee shall receive a base salary as mutually agreed upon, which may be increased or decreased at any time by the Company upon notice to the Employee prior to the beginning of the next payment period. The Employee's salary shall be payable in equal installments, less withholdings and deductions required by law at such intervals as may be established by the Company. If the Employee's employment pursuant to this Agreement commences or terminates within a payment period, the salary payable to the Employee by the Company shall be prorated on a daily basis and the Employee shall receive the prorated amount of such salary for the actual number of days in the payment period that the Employee was employed by the Company. The Employee shall be entitled to no further compensation in the form of salary after the effective date of any termination or resignation of employment.

**2.2    Benefits.** If eligible, the Employee shall be entitled to participate in any employee benefits plan or plans that the Company, in its sole discretion, may make available to its employees from time to time, in accordance with the provisions thereof.

## SECTION 3
## PROTECTIVE COVENANTS

**3.1    Company's Line of Business.** The Employee acknowledges and agrees that (i) the Company is currently engaged in the business of growing, processing, manufacturing and selling industrial hemp and the products associated with such crop, as well as the research and development of the same, and (ii) the Company is also engaged in consulting for other persons involved in the same area of the agricultural industry (collectively, the "Line of Business").

Employee Initials

## EXHIBIT 1

**3.2    Company's Geographical Area of Business.** The Employee acknowledges and agrees that the Company presently has operating locations in Georgia, Oregon, Colorado, Washington and North Carolina, and from those facilities the Company services customers in approximately forty-five (45) states, as well as internationally. Employee acknowledges that he is performing work at the location and in the areas listed on Exhibit A (the "Territory").

**3.3    Non-Compete Covenants.** The Employee shall not compete with the Company as provided below:

**3.3.1    During Employment.** The Employee agrees that during employment with the Company, the Employee will not directly or indirectly, either on the Employee's own behalf or on behalf of any other individual or entity:

(a)    compete with the Company; or

(b)    own, manage, operate, consult with, be employed by, nor have any financial relationship with, participate or be connected in any manner with the ownership, management or control of any business similar to the type of business, or in the same Line of Business in which the Company is engaged.

**3.3.2    Post-Employment.** For a period of twenty-four (24) months immediately following the last date of the Employee's employment with the Company (the "Restricted Period"), the Employee agrees that he/she will not, directly or indirectly, in any capacity, as an employee, owner, director, officer, consultant, independent contractor, agent, or any other capacity, either directly or indirectly, perform or undertake any responsibility substantially similar to any duty or responsibility Employee performed for the Company at any time within two (2) years of the termination of Employee's employment, for or on behalf or in support of the operations or activities anywhere in the United States, or in any other broader geographic area in which the Company is engaged in the Line of Business at any time during Employee's employment, of any person or entity that is competing with the Company in the Line of Business.

Employee further agrees that upon a violation of this covenant, the Restricted Period for this covenant will be extended by the number of days equal to the period of such violation. Should any court or arbitration panel deem the Post-Employment Prohibited Territory to be too broad to be enforceable because of the inclusion of each of the provisions in this Agreement, then such court or arbitration panel may blue-pencil and delete any of the separately designated areas of subparts in this Agreement, so as to leave the remaining areas as the defined, enforceable Post-Employment Prohibited Territory.

Employee Initials

**EXHIBIT 1**

**3.4** **Non-Solicitation Covenants.** The Employee agrees not to solicit as provided below:

**3.4.1** **Employees or Independent Contractors of the Company.** During the Restricted Period, the Employee shall not (a) solicit, attempt to solicit, or induce any current or future employee or independent contractor of the Company to leave his or her employment or independent contractor position with the Company; or (b) hire or attempt to hire any current or future employee or independent contractor of the Company.

**3.4.2** **Customers and Vendors.** During the Restricted Period, Employee agrees that he/she will not, directly or indirectly, alone or as a partner, officer, director, member, employee or independent contractor of any company or business organization, recruit or solicit "Customers" or "Vendors" of the Company for the purpose of competing with the Company in the Line of Business. For purposes of this Section , the term "Customers" and "Vendors" shall be limited to those Customers and Vendors with whom Employee had any Material contact, as defined in O.C.G.A. § 13-8-51(10).

**3.5** **Information About Company.**

**3.5.1** **In General.** It is expected that during the course of employment of the Employee by the Company, in order to assist the Employee in the performance of the Employee's duties described in Exhibit A, the Employee will receive specialized, confidential and proprietary information including and concerning:

(a) the relationships between the Company and its various customers, including the identity of customers of the Company, the identity of the contact persons employed by the customers of the Company, and the special needs of the customers of the Company;

(b) the processes, products and services provided by the Company to its customers;

(c) the business policies, pricing strategies and business procedures of the Company; and

(d) the intellectual property and other trade secrets and confidential information of the Company.

**3.5.2** **Special Trust and Confidence.** The Company will place special trust and confidence in the Employee, on the understanding that the Employee will keep confidential any business information shared with and disclosed to the Employee.

**3.5.3** **Training.** The Company may provide the Employee with specialized training in how to carry out the business of their duties.

**3.5.4** **Customer Relationships.** The Company may invest its resources to develop personal and business relationships between the Employee and the Company's

Employee Initials

**EXHIBIT 1**

customers, based on the Parties' mutual understanding that those relationships belong to and are the property of the Company.

**3.6   Employee's Acknowledgement of Company Materials.** The Employee acknowledges that the Company, and/or any of its affiliates, have developed various work products including certain chemical, biological, botanical and physical formulas and materials, as well as work products such as documents, reports, presentations, processes, program guides, service guides, pricing structures, as well as all of the Confidential Information (as defined in Section 3.8 of this Agreement), and other documents (including copies and electronic versions thereof) in connection with providing services and products to customers of the Company (the "Company Materials"). The Company Materials may include work products originated or developed by the Employee or others while in the Company's employment. The Employee acknowledges that the Employee has no right to or interest in any of the Company Materials that the Employee may see or use during employment with the Company.

**3.7   Employee's Covenants of Non-Disclosure of Company Materials.**

**3.7.1   During Employment.** The Employee agrees that during  employment with the Company, the Employee shall refrain from photographing, videotaping and making audio recordings on the Company's property or of any Company Materials. The Employee also agrees to refrain from disclosing to, or using on behalf of, any person or entity other than the Company, any and all Company Materials which are made known to the Employee by the Company, its officers or employees, or that the Employee learns of or develops during employment with the Company.

**3.7.2   Post-Employment.** The Employee agrees that during the Restricted Period, the Employee shall refrain from disclosing to, or using on behalf of, any person or entity other than the Company, any Company Materials. Upon the end of the Employee's employment with the Company, the Employee shall immediately deliver or cause to be delivered to the Company all Company Materials in the Employee's possession or control, as well as all other materials furnished to or acquired by the Employee as a result of employment with the Company.

**3.8   Employee's Acknowledgement of Confidential Information.** The term "Confidential Information," as used in this Agreement, means all information or material not generally known to the public or the industry in which the Company is or may become engaged in which: (a) gives the Company some competitive business advantage or the opportunity of obtaining such advantage, the disclosure of which could be detrimental to the interest of the Company; (b) is owned by the Company or in which the Company has an interest; or (c) is either marked "confidential" or "proprietary" or the Employee knows or should know that the information or material is considered to be confidential and proprietary to the Company. Confidential Information includes, without limitation, the following types of information (whether or not reduced to writing): trade secrets (as defined in Section 6), chemical, biological and botanical formulas and materials, inventions, proposals, tapes, file data, documentation, diagrams, specifications, know-how, processes, formulas, models, flow charts, graphs, support data, supplier lists, purchasing methods or practices, software in various stages of development,

Employee Initials

**EXHIBIT 1**

the Company's finances, research and development procedures and test results, marketing techniques, studies and materials and plans, price and discount lists, pricing policies, distribution and selling activities, consultants' reports, business plans, customer and vendor identities and agreements, customer lists, prospect lists, financial reports, budgets, projections, cost analyses, proprietary computer software and systems, and employee files. Confidential Information also includes any information described above which the Company obtains from its customers or any other party and which the Company treats as confidential, whether or not owned or developed by the Company.

### 3.9 Employee's Non-Disclosure of Confidential Information Covenants.

**3.9.1   During Employment.** The Employee agrees that during  employment with the Company, the Employee will refrain from disclosing to, or using on behalf of, any person or entity other than the Company any Confidential Information which is made known to the Employee by the Company, its officers or employees, or that the Employee learns during employment with the Company.

**3.9.2   Post-Employment.** The Employee agrees that during the Restricted Period, the Employee shall refrain from disclosing to, or using on behalf of, any person or entity other than the Company, any Confidential Information. Upon the end of the Employee's employment with the Company, the Employee shall immediately deliver or cause to be delivered to the Company all of the Confidential Information in the Employee's possession or control.

### 3.10   Inventions and Intellectual Property.

The Employee acknowledges that all developments, including, without limitation, inventions, patentable or otherwise, discoveries, improvements, patents, trade secrets, designs, reports, computer software, flow charts and diagrams, procedures, data, documentation, ideas and writings and applications thereof relating to the present or, to the extent the Employee is notified in writing, planned business of the Company or any affiliate that, alone or jointly with others, the Employee may conceive, create, make, develop, reduce to practice or acquire during the term of this Agreement (collectively, "Developments") are works made for hire and shall remain the sole and exclusive property of the Company, and the Employee hereby assigns to the Company all of the Employee's right, title and interest in and to all such Developments. All related items, including, but not limited to, memoranda, notes, lists, charts, drawings, records, files, computer software, programs, source and programming narratives and other documentation (and all copies thereof) made or compiled by the Employee, or made available to the Employee, concerning the business or, to the extent the Employee is notified in writing, planned business of the Company or any affiliate of the Company shall be the property of the Company and shall be delivered to the Company promptly upon the termination of this Agreement. This provision shall survive the termination of this Agreement.

### 3.11   Non-Circumvention and Compliance with Safeguards.

The Employee shall not circumvent or attempt to circumvent any safeguards (electronic or otherwise) instituted by the Company to protect its Confidential Information or trade secrets including, but not limited to,

Employee Initials

**EXHIBIT 1**

any safeguards designed to prevent the unauthorized copying or dissemination of any Confidential Information or trade secrets.

**3.12    No Right of Privacy on Company Premises or While Using Company Equipment.** The Employee recognizes and agrees that the Employee has no right to privacy whatsoever while physically present on the Company's property. The Employee also recognizes and agrees that the Employee has no right to privacy whatsoever while using any of the Company's electronic equipment or services (including, but not limited to, Company laptops and desktop computers as well as the Company's internet connection), or using any Company email address, phone, Facebook account, or any other social media account, and that the Company may monitor and record any and all activity taking place on the Company's electronic equipment and services.

**3.13    Non-Disparagement.** During the employment of the Employee and for a period of three (3) years from the Employee's last day of employment, the Employee agrees not to disparage the Company, any agent, any client or customer of the Company, or any potential client or customer of the Company.

**SECTION 4**
**SCOPE OF RESTRICTIVE COVENANTS**

**4.1    Reasonableness.** The Employee acknowledges and agrees that the Employee has read and understands all restrictive covenants contained in Section 3 of this Agreement, and acknowledges that the restrictive covenants are necessary to protect the legitimate business interests of the Company, and the Employee acknowledges that the Employee may develop contacts and relationships which the Employee otherwise would not have had access to or developed. The Employee further acknowledges that such information and relationships would give the Employee an unfair competitive advantage should the Employee compete with the Company, and the Employee agrees that the geographic limitations and time period restrictions contained in the restrictive covenants herein are reasonable and will not, in the view of the Employee's abilities and experience, restrict the Employee from obtaining suitable employment elsewhere upon termination of the Employee's employment with the Company for any reason whatsoever.

**4.2    Employment as Consideration.** The Employee acknowledges and agrees that the duties and obligations of the Employee contained in Section 3 of this Agreement constitute an integral part of the total consideration for the Employee's employment with the Company and that without the Employee's agreement to adhere to the duties and obligations contained in Section 3 of this Agreement, the Company would not offer employment to the Employee and allow the Employee access to customer lists, Company Materials, and/or Confidential Information.

**4.3    Enforceability.** The Employee acknowledges and agrees that the obligations contained in Section 3 of this Agreement are enforceable independent of any other provision of this Agreement. The Employee acknowledges and agrees that the Employee's obligations in Section 3 of this Agreement shall be enforceable in accordance with their terms despite: (a) any

Employee Initials

termination of the Employee's employment with the Company; (b) any termination of this Agreement; or (c) any breach by the Company of any provision of this Agreement.

**4.4 Company's Rights and Remedies.** The Employee acknowledges and agrees that if the Employee violates any of the restrictive covenants contained in Section 3 of this Agreement, the Company shall have the following rights and remedies against the Employee:

**4.4.1** The Company may obtain injunctive relief in any court of competent jurisdiction requiring the Employee to perform specifically the obligations of this Agreement, including the terms of Section 3.

**4.4.2** The Company may recover all monetary damages for any and all lost profits, incidental and consequential damages, and/or any other damages suffered by the Company as a result of the Employee's violation of the restrictive covenants set forth in this Agreement.

**4.5 Liquidated Damages.** The Company and the Employee agree that it may be difficult or impossible to determine with any reasonable accuracy the amount of prospective damages to the Company in the event that the Employee violates Section 3 of this Agreement. Therefore, the Parties agree that in the event of such violation, liquidated damages will be paid by the Employee to the Company in the amount of Fifty Thousand and No/100 Dollars ($50,000.00). The Company and the Employee agree that the liquidated damages set forth above are reasonable, and not a penalty, based upon the facts and circumstances of the Parties at the time of entering into this Agreement and with due regard to future expectations. These liquidated damages are <u>not</u> in lieu of any other claims for damages due to the Employee's violation of this Agreement, but are in addition to the right of the Company to obtain injunctive and/or equitable relief to prohibit the violation of this Agreement, or obtain specific performance or any other equitable remedy required to enforce any provision of Section 3 of this Agreement.

## SECTION 5
## SURVIVAL OF COVENANTS

**5.1 Survival of Covenants.** The Employee acknowledges and agrees that the obligations, duties and restrictive covenants contained in Section 3 of this Agreement shall survive for a period of twenty-four (24) months immediately following the last date of the Employee's employment with the Company. Pursuant to Section 8 of this Agreement, if applicable, the Employee acknowledges and agrees that the Company has the right to release the Employee from compliance with Section 3.4.2, Section 3.5.1, or Section 3.5.2 of this Agreement and that such release shall not have an effect on the Employee's continued compliance with all other restrictive covenants contained in Section 3 of this Agreement, and all remaining restrictive covenants, duties, and obligations of the Employee shall survive for a period of twenty-four (24) months immediately following the last date of the Employee's employment with the Company.

Employee Initials

## EXHIBIT 1

## SECTION 6
## TRADE SECRETS

**6.1     Trade Secrets.** The term "trade secret" means information of the Company and its business contacts, suppliers, and customers, without regard to form, including, but not limited to, technical or non-technical data, formulas, patterns, compilations, programs, devices, methods, techniques, drawings, processes, financial data, financial plans, product plans, or lists of actual or potential customers or suppliers which is not commonly known by or available to the public and which information: (a) derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

**6.2     Protection of Trade Secrets.** All information considered trade secrets will be entitled to all the protections of the law under the Georgia Trade Secrets Act, as defined in Title 10 of Article 27 of the Official Code of Georgia Annotated. The Employee agrees that all non-disclosure covenants described in Section 3 of this Agreement are in addition to, and do not exclude, any information considered a trade secret under the Georgia Trade Secrets Act. The Employee's obligations under the Georgia Trade Secrets Act shall survive the termination of this Agreement.

## SECTION 7
## EMPLOYEE'S REPRESENTATIONS AND WARRANTIES

**7.1     No Conflicting Agreements.** The Employee agrees not to disclose to the Company or induce the Company to use any confidential or proprietary information belonging to any of the Employee's previous employers, to any customers of the Employee's former employers, or to others. Further, the Employee represents and warrants to the Company that the performance of the Employee's job duties as set forth in this Agreement and as may be assigned to the Employee from time to time by the Company shall not violate, cause the breach of, or conflict with any prior agreement, contract, or understanding between the Employee and any third party or otherwise violate any confidence of another, including but not limited to, any agreement prohibiting the Employee from competing with such third party. The Employee is not bringing any third party's trade secrets or confidential information with them to the Company. The Employee is not bringing any of their own trade secrets, confidential information, inventions, or sales lists to the company. In the event that the representations and warranties made by the Employee above are not true, accurate, or correct, the Employee agrees that the Employee will indemnify and hold harmless the Company and its successors and assigns against any loss, damage, claim, or expense (including reasonable attorneys' fees based on the customary hourly rates then charged for their services) incurred by the Company or its successors or assigns that arise out of or are related to the breach of these representations and warranties to the Company as set forth above.

**7.2     Indemnification.** Employee will defend, indemnify, save and hold harmless Company and its affiliates and their respective officers, directors, agents and employees from and against any loss, cost or damage (including reasonable attorneys' fees and expenses)

Employee Initials

## EXHIBIT 1

(collectively, "Damages") in connection with any and all claims arising out of or on account of (a) Employee's breach of any representation, warranty, covenant or obligation contained in this Agreement; (b) any fraud or misrepresentation by Employee; or (c) Employee's violation of or failure to abide by any applicable laws or regulations.

7.3     **Company Materials.** Immediately upon request of the Company and, in any event, at the time of the termination of my employment, Employee will deliver to the Company all of the Company's property or records in Employee's possession, custody or control, including, but not limited to, Confidential Information and Trade Secrets of the Company, information technology hardware, software, electronic devices of any kind, cell phones, keys, passwords, entry or access badges, portable storage drives, notes, calendars, documents, drafts, papers, marketing materials, or any other documents or electronically stored information that is the property of the Company.

## SECTION 8
## LIMITATION OF LIABILITY

LIMITATION OF LIABILITY: OTHER THAN FOR GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, THE COMPANY SHALL NOT BE LIABLE TO EMPLOYEE FOR ANY DAMAGES RELATED TO EMPLOYEE'S EMPLOYMENT.

## SECTION 9
## MISCELLANEOUS

9.1     **Governing Law; Consent to Jurisdiction and Venue.** This Agreement shall be governed and construed in accordance with the laws of the State of Georgia. The state and federal courts located in Georgia shall have exclusive jurisdiction of any dispute arising out of or in connection with this Agreement. Both parties hereby submit to the jurisdiction of said courts for purposes of any such suit or proceeding, and waive any claim that any such forum is an inconvenient forum. Further, the Employee irrevocably consents to venue in the state and/or federal courts having jurisdiction over Fulton County, Georgia.

9.2     **Assignment.** The rights and obligations of the Company under this Agreement may be assigned and delegated by the Company to any successor to or assignee of the Company's operations. The rights and obligations of the Employee under this Agreement are personal and may not be assigned or delegated by the Employee.

9.3     **Indemnification.** The Employee shall indemnify and hold harmless the Company, its officers, directors, affiliates, and employees, and the representatives, agents, and other controlling persons of each of them, from and against all liability, damage, losses, costs (including, without limitation, court costs), and expenses (including, without limitation, reasonable attorneys' fees) which any of them may incur by reason of:

Employee Initials

**EXHIBIT 1**

**9.3.1**   The failure of the Employee to fulfill any term or condition of this Agreement; or

**9.3.2**   Any breach made by the Employee of any representation, warranty, covenant, or agreement contained in this Agreement.

**9.4**   **Severability.**

**9.4.1**   If any provision, term, paragraph, subparagraph or subpart of this Agreement shall, for any reason, be ordered or adjudged by any court of competent jurisdiction to be invalid or unenforceable, such judgment shall not affect, impair or invalidate the remainder of this Agreement but shall be confined in its operation to the provision or provisions regarding which such judgment shall have been rendered.

**9.4.2**   If any provision, term, paragraph, subparagraph or subpart of this Agreement is ordered or adjudged by a Court of competent jurisdiction to be invalid, unenforceable or unreasonable, such provision shall be reformed as provided for by law, and/or shall be deemed amended, to apply as to such maximum time, scope and territory or to such other extent as the adjudicating authority may determine or indicate to be reasonable, such amendment to apply only with respect to the operation of such provisions in the particular jurisdiction in which such adjudication is made.

**9.5**   **Notices.**   Any notices required or permitted to be given under this Agreement shall be sufficient if in writing and shall be deemed communicated on the date when delivered in person or when delivered, by certified mail, postage prepaid, to the Company's business address if to the Company or the Employee's last known address if to the Employee.

**9.6**   **Drug Testing.**   The Employee agrees, upon request of the Company, to submit to a drug and/or alcohol testing and to furnish a sample of the Employee's urine, breath and/or blood for analysis for pre-employment, during employment (random/for cause), and for post-accident screening. The Employee understands and agrees that if the Employee, at any time, refuses to submit to a drug or alcohol test, or if the Employee fails to cooperate with the testing procedures, the Employee will be subject to cancellation of their application and/or immediate termination of their employment. The Employee further authorizes and gives full permission to have the Company and/or any physician, clinic, hospital, laboratory, medical institution or other healthcare provider, disclose to the Company and/or its designated representatives, the specimen or specimens collected at a lab for a screening test for the presence of any prohibited substances, and for the lab or other testing facility to release any and all documentation/results relating to the test to the Company and/or its representatives. This also includes any governmental entity involved in a legal proceeding or investigation connected with the test. The Employee does hereby agree to forever release and discharge the Company, any physician, clinic, hospital, laboratory, medical institution or other healthcare provider to the full extent permitted by law from any claims, damages, losses, liabilities, costs and expenses, or any other charge or complaint arising from the testing, including loss of employment or any other kind of adverse job action that might arise as a result of drug and/or alcohol testing.

Employee Initials

**EXHIBIT 1**

**9.7    Section Titles.** Section titles appearing in this Agreement are inserted for convenience only, and are in no way to be construed as a part of this Agreement, or as a limitation on the scope of the particular Section to which they refer.

**9.8    Dispute Resolution/Arbitration.** Employee agrees that any claim, dispute, and/or controversy that he/she may have against the Company arising from, relating to, or having any relationship or connection whatsoever with the Fair Labor Standards Act ("FLSA"), any state wage and hour statute, or any other claim or cause of action alleging that Employee was paid improperly or paid insufficient wages, overtime, or any compensation, shall be submitted exclusively to and determined exclusively by binding arbitration before a single arbitrator under the Federal Arbitration Act, 9 U.S.C. § 1 et seq. and the JAMS Employment Arbitration Rules & Procedures. Any such arbitration may not be brought on a class or collective basis.

Employee agrees and understands that the arbitrator has no authority to and shall not consolidate claims of different contractors/employees into one proceeding, nor shall the arbitrator have the power to hear an arbitration as a class or collective action (a class or collective action involves an arbitration or lawsuit where representative members of a group who claim to share a common interest seek class or collective relief), and Employee shall not be allowed to submit my claim(s) against the Company to arbitration as a representative of or participant to a class or collective action or a claim seeking class or collective relief. The validity of this class or collective action waiver shall be decided by a court rather than by the arbitrator. If this class or collective action waiver is deemed to be unenforceable, then the Company and Employee agree that the class or collective claims in issue shall not be arbitrated pursuant to this Section.

Employee agrees and understands that nothing in this provision prohibits Employee from filing at any time a charge or complaint with a government agency. However, upon receipt of a right to sue letter or similar administrative determination, Employee's claims become subject to arbitration as defined herein. Importantly, nothing in the policy prevents Employee from engaging in protective concerted activity and/or discussing any of the terms and conditions of my employment with other co-workers.

The parties agree and understand that any arbitration hearing shall be held at a location within twenty-five (25) miles of Employee's last place of employment with the Company, unless the parties agree otherwise.

The parties agree and understand that unless the arbitrator finds good cause otherwise, discovery will be limited to one individual deposition for each party and fifteen (15) requests for production documents and fifteen (15) interrogatories.

For purposes of this Section the "Company" includes its members, directors, officers, employees, managers, and agents.

**9.9    Waiver of Breach.** The waiver of either Party of a breach of any provision of this Agreement by the other shall not operate or be construed as a waiver of any subsequent breach by such breaching Party.

_Employee Initials_

**EXHIBIT 1**

**9.10     Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original and together shall constitute one in the same Agreement.

**9.11     Amendment.** This Agreement may not be amended except by a written instrument executed by the Employee and the Company.

**9.12     No Rule of Construction.** Each of the Parties to this Agreement has been, or has had the opportunity to be, represented by counsel who have each been involved in the drafting of this Agreement or have had an opportunity to have input into the terms of this Agreement. Accordingly, this Agreement shall not be construed either against or in favor of any Party based upon that Party's role in drafting this Agreement, and any rule of construction to the effect that any ambiguities are to be resolved against the drafting Party shall not be employed in the interpretation or construction of this Agreement.

**9.13     Entire Agreement.** This Agreement contains the entire agreement of the Parties, and supersedes all previous understandings and agreements between the Parties, whether oral or written. This Agreement may not be modified except in a written agreement signed by all Parties.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

**[SIGNATURE PAGE FOLLOWS]**

Employee Initials

**EXHIBIT 1**

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date herein first above written.

**THIS CONTRACT CONTAINS AN ARBITRATION AGREEMENT THAT MAY BE ENFORCED BY THE PARTIES.**

**COMPANY:**

RMH HOLDINGS, LLC

By:_____
Name:_____
Title: _____

**EMPLOYEE:**

_____(SEAL)
Name: _____
Address: _____
_____

I:\Client Files\P\P0303\0010\Docs\RMH Emp Agmt_082418 (002).docx

Employee Initials

**EXHIBIT 1**

<u>EXHIBIT A</u>

EMPLOYMENT LOCATION AND JOB DESCRIPTION

Employee's Physical Location:

*Colorado*

Geographic Area to be Covered by Employee:

*Global*

Job Position, Description and Duties:

*[handwritten]*

*[signature]*
Employee Initials

**EXHIBIT 1**